Good morning. Ready to call our first case, United States v. Advantage Medical Transport. Mr. Greenberg. Good morning, Your Honors. Good morning. My name is Mark Greenberg. I'm the attorney for the appellants. With the court's permission, I would like to reserve three minutes for rebuttal. Okay. That's done. Thanks. Your Honor, this is a case involving an actual loss calculation. And as a result, there is a causation element that is involved in whether or not the loss resulted from the defendant's conduct. Now, that loss calculation, loss is a sort of quintessential question of fact, right? It is a quintessential question of fact. In large measure, yes. Right. And Judge Conner spent a significant amount of time and heard evidence and made judgments, and in fact made a lot of judgments about the loss in your client's favor and ended up at a specific number that he thought was factually correct, right? That's what he thought. Okay. So how is he clearly erroneous? By virtue of the fact that the acts of deception occurred in response to the August 2010 Highmark letter and not before. All of the acts of deception, of the falsification of the ambulatory abilities of the beneficiaries, of the explanation to the EMTs about how to fill out the trip sheets, right, all that occurred post-August 2010. And help me understand, maybe my colleagues understand it, and I'll apologize if I'm the only one who doesn't, help me understand why that timing makes a difference if the loss, if these were losses occasioned by your client's unlawful conduct, even if it's cover-up conduct. I mean, what you seem to be saying is he can't be liable for those losses because that has to do with the cover-up, and the cover-up doesn't really count. Am I understanding your argument right? No, it's not so much the cover-up because by virtue of the fact that there were 4,000 trip sheets that referenced the ambulatory abilities of the beneficiaries that were found by the agents here, that reflects that this was not a fraud scheme from its very inception. Well, when you say that, that is a question of fact. That's what I'm trying to get at. You're saying, well, that shows that he wasn't being fraudulent. But Judge Cotter looked at it and said, no, I think he was intending to defraud in those circumstances. So the fact that he engaged in cover-up after the fact, how does that undermine the judge's determination that before the cover-up activities began in earnest, he was intending to defraud? Why does the existence of the cover-up undermine a fact-finding that there was an intent to defraud before the cover-up? That's what I'm wrestling with. Because there's no evidence of all. I don't think you can take a retrospective look at this factual pattern here. The fact is that Advantage and Mr. Sibchuk had medical necessity determinations by the physicians of all of the beneficiaries. We can get into medical necessity in a moment when we talk about the regulation itself and your position that having a CMN by itself was enough. But the existence of a certificate of medical necessity by itself, assuming that he had those in lots of instances, is one factor. Are we moving to a position where you're saying it is a determinative factor? There's no appropriate way that a court could look at the facts and say fraud if there is a CMN? No. The court can theoretically say there's a fraud if there's a CMN. But the point I'm trying to make here is that there has to be a causal connection between the defendant's acts and the loss. The court appears to be saying to me that that causal connection could have been found pre-August 2010 Highmark letter. I'm suggesting to the court that if there is a cover-up, that doesn't mean that Advantage would not have been entitled to payment pre-2010. I don't see how you can say, it would be hypothetically, let's say for example that Advantage engaged in deceptive conduct on the last day it was in business. Does that mean that everything that came before it would necessarily flow from criminal conduct? No, but I don't understand that to be the factual scenario we're dealing with here. You can point me to the record where something says to the contrary, but I thought that the position that the government was taking and that the district court accepted was not that there was some late fraud that retroactively tainted earlier good behavior, but that there was fraud throughout. They made their case, they put on evidence, and you put on evidence, I mean your client, whoever was representing you at the time, put on evidence. And the district court judge looked at it all and said, I think there was fraud in all these instances amounting to this amount of money. And the logical challenge I'm having is with your assertion that somehow the high mark letter is a definitive marking point, that there's no way the district court judge could have looked at that pre-high mark letter behavior and said there was fraudulent intent there, there was bad acting there, that's covered by the crime he pleaded guilty to, and that loss is going to be counted. You seem to point to the high mark letter as a hard stop, nothing before that could be fraudulent. I'm just trying to figure out why you think that's the case. Because factually there was nothing that was done that was shown by the government pre-high mark letter that was reflective of fraudulent conduct. But there was billing for transports that were later determined not to be medically necessary. Why wouldn't that be fraudulent? That conduct, the government says, went from 2007 to 2011. Well, that's the rub of the case. The rub of the case is whether or not you can look retrospectively and say that Mr. Sidchuck engaged in criminal fraudulent conduct for having non-medically necessary transports when at the point in time that the transports were made, there was a medical necessity determination. Yes, there was a determination, but as Judge Jordan asked before, you can have fraudulent conduct even if you have the CMN. Well, you can have fraudulent conduct, but by virtue of the fact that you don't have a factual basis to show the fraudulent conduct pre-high mark letter, I think speaks volume to the fact that maybe at some point when that high mark letter came to Mr. Sidchuck's attention, maybe a bell went off in his head to say, Yeah, doesn't the mere fact that he would think that indicate, as the government seems to argue, that he did, that there is a guilty mind there. He understood that what he was doing before was unlawful. You don't cover something up if you think it's lawful. You cover it up if you think it's unlawful, and he thought it was unlawful, and that's why he started covering it up. But that's a question of when that mindset came into being. What belies the suggestion that he knew from the inception that the ambulatory abilities of the beneficiaries would be relevant in Medicare's decision to pay is the fact that there were some 4,000 trip sheets that were uncovered that actually reflected the ambulatory abilities of those individuals. And a finder of fact could look at that and come to the conclusion you're suggesting, Mr. Greenberg, which is he didn't understand or think that was unlawful until the Highmark letter came. But a finder of fact could, without being clearly erroneous, come to a different conclusion, couldn't one? Couldn't one look at the facts and say, you know, he wasn't covering his tracks as well as he thought later he needed to cover his tracks, but he knew what he was doing was unlawful because he had people riding around with him who didn't need to be riding around with him, and he knew they shouldn't have been with him. I've looked at all the evidence, I've heard the evidence, I've heard from experts, and I look at this and think no smart guy like Mr. Sipchuck, owning and running a company as a young man successfully as he did, could have done this without knowing, I'm nailing the government here, I'm getting money I shouldn't. I mean, that seems to be what Judge Conner did. But if that was the factual basis of the decision, and in fact if that supported the decision, then I dare say there would have been some evidence in advance of the Highmark letter that reflected that mindset. That's the point. If there was anything out there that the district court could say that's reflective of criminal activity pre-August 2010, I see your point. I'm just asking questions, I'm not making points. Is there anything in the plea colloquy that sheds light on this? Did your client stand up and say, yeah, I'm pleading guilty, but not to anything that happened before the Highmark letter. I'm guilty of fraud, but not for anything before that Highmark letter came in. By virtue of the fact that he pleads guilty to count 15, and count 15 has a discrete date that comes after the Highmark letter, then that is reflective of the fact that he is pleading guilty to criminal conduct that occurs after the Highmark letter. So no relevant conduct could occur before that? If it results from the criminal actions of the defendant, yes, of course, because that's what the actual loss requirement is. And all I'm suggesting, Your Honor, is by virtue of the fact that there was no evidence of pre-Highmark letter fraudulent activity, and in fact there was evidence affirmatively showing that the beneficiaries were ambulatory, then that's reflective of the fact that any criminal conduct, any criminal idea came into being post-Highmark letter. Now, with respect to the CNN, the fact of the matter is that the state of the law was muddled when Mr. Sitchuk and Advantage transported the patients between 2007 and 2011. It was muddled to the degree that the Centers for Medicare and Medicaid Services was required to issue a rule that basically publicized... Were they required to? Were they required to? Yeah, you said it was so muddled they were required to do that. The Centers for Medicare, they chose to come out and say, CNN by itself isn't enough, but is there anything in the record that indicates that there was such general confusion that this was forced on the government, or is this just sort of ordinary agency clarification that comes along? I'd say it's the latter by virtue of the fact that there was two different cases that said a CNN in and of itself is significant and sufficient, and other cases that said to the contrary. But the point is that if the experts like the CMS is required to issue clarifications, how can you hold an ambulance owner criminally responsible for not knowing what the clarification was or what the absolute rule was when he transported the patients? Was there testimony to the effect that he relied on that muddled, as you called it, muddled nature of that provision in transporting? There was no testimony that he relied on that, but the fact of the matter is that are we prepared to hold an individual criminally liable that extends his prison term, that increases his restitution, that increases his fine, when the federal agency that's responsible for the way the law is handled is required to issue a clarification as to what the correct rule is? I say that that's grossly unfair. If a district court feels one way, another district court feels another, and the Centers for Medicare and Medicaid are required to step in, why should Mr. Sitchak spend more time in jail or have a higher fine than he would if the state of the law was clear? I don't think it's fair. Okay. All right. Thank you, Screamer. We'll have you back on rebuttal. Mr. Screamer. Good morning, Your Honors. May it please the Court, Stephen Screamer on behalf of the United States. Looking first at the calculation of laws this year, it was certainly the government's position, and Judge Conard did adopt it, that the fraud that occurred in this case that led to the offense of conviction was not an end in and of itself. It was a means to an end, and the means to an end would be to cover up fraudulent activity in the billing for non-medically necessary medical transport. That is how you look prior to the Highmark letter, because at the time of the Highmark letter, you immediately have the defendants starting to alter trip sheets, altering CMNs, giving guidance to their EMTs as to how to properly report trips, how to phrase things. Yes, that is going forward, looking forward, but it is also covering up the specific 14 instances of trip sheets that they felt would be problematic in any Highmark audit, and it is reasonable, and certainly not clearly erroneous, to look at that and say they are attempting to escape discovery. Okay. Well, let's assume for the sake of discussion that, you know, we are inclined to agree with you on that point. There are other arguments that are made by the defense that I would be interested in your response to. The first one is their assertion that the abuse of a position of trust enhancement is not in order here, and the suggestion is that the district court ignored and that we would be ignoring if we endorsed it. Our own caution that all fraud involves some abuse of trust. That is definitionally the case, so it can't be that an abuse of trust enhancement is warranted in every fraud case. Something more has to be going on here, and there was no position of trust that Mr. Sivchuk held with respect to the federal government. That is, I understand, to be the tenor of their argument, and I would like you to respond to the specific point they make, that he just didn't, you know, this was an arm's length contractual arrangement that a contractor had going forward. There was no fiduciary responsibility. There was no position of trust that you can point to. What is your answer to that? My answer to that is certainly you look at this court's precedent as to how do you determine whether there is a position of trust and whether that trust has been abused. In Tye, we look at what establishes a trust relationship. What is the position of the defendant? Well, we would say here the position of the defendant is, while not a medically trained doctor, certainly has EMTs on the staff, has the ability to see whether some of these patients are walking out of their houses in some of these cases, and Medicare is not in that position. Well, yeah, he's a business guy. That's it, right? I mean, in the other cases we've dealt with, it's been some medically trained person, and the reason that they got tagged with the abusive position of trust was because of this sense that society has to put trust in people with special medical training. This is a guy who drives a van, hires people to drive a van. What makes him so special that society should look at him and smack him around? Because he does that, he just happens to do it, and the government pays him for it. Well, I wouldn't agree that it's quite as simple as just driving a van. We're talking about dealing with patients, some of which are bed-confined. We're talking about having to hire EMTs, performing a very specialized service, a service that Pennsylvania licenses. And so, therefore, it's a little bit more than just driving a van. You're talking about people's health. Second of all, I would say, well, we have the Nathan case, which was Dustin Barbario. But the Nathan case didn't involve medical individuals. It was government contracting as far as the defense, defense contracting, and talked about the position of trust that was placed in a president who has the ability to do what Mr. Sivchuk did here, alter documents and cover up behavior and avoid additional examination or attempt to avoid additional examination from the United States government and its agencies, as it's dealing with departments that are spending millions, hundreds of millions, billions of dollars, and simply can't examine every single contract. You're saying he was attempting to cover up, he was trying to avoid discovery. Why wouldn't we be talking about an obstruction of justice enhancement as opposed to abuse of position of trust? Well, it certainly was discussed by the district court. Ultimately, the district court decided not to enhance the sentence based on obstruction of justice, and we chose not to appeal that decision. Excuse me, but if he didn't obstruct justice in that manner, then he didn't abuse a position of trust. Well, I think that you can certainly attempt to obstruct justice and commit crimes and still abuse a position of trust. Just the attempt, it could have been successful. It wasn't in this case, but it certainly could have been successful. And why could it have been successful? Because he was in a position to falsify documents as the president of the corporation, of the company, and was in a position to submit that to a federal agency, even through HIMARS. So any managerial level employee of a company that does business with the federal government that falsifies documents, then is subject to an abuse of position of trust? No, it certainly wouldn't go that far. It is a factor to consider. Where do you draw the line? Where do you draw the line? Because that's the whole argument you've made. And that's your Nathan case reliance, and that seems to be what you're saying. Well, that is certainly part of what we're saying. Also looking at, however, the relationship between Medicare and these medical providers and the fact that Medicare is such a huge agency that has to rely on the integrity of its providers because it simply cannot... But he has a certificate of medical necessity. Why can't he simply just rely upon that? Because Medicare decided in its regulations that that would not be enough. And I understand that in 2013 or around 2012, middle of 2012, they chose to expand upon that, and they were not required to do so. They chose to because of the decisions out of the district court in Tennessee. But it is, of course, the government's position, as it was CMS's position at the time, that even the previous version of the regulation required medical necessity, both looking at the general rule and then also in the wording of the specific rule. So your position, I'm still trying to find your limiting principle. You said Medicare is faced with such a large task it has to rely on what the people like Mr. Sivchuk say. Isn't that just another way of saying if you do business with the federal government, you're in a position of trust? Because we can't do it ourselves. We have to trust you to do it. Ipso facto, you're in a position of trust. What's different about what I just said than what you just said? Well, I think it's multiple factors. I agree that if you take each one of these individual things, they may not be enough to simply say this person is abusing a position of trust. That being said, if you take all of these factors together. What other ones? What are you pointing to other than the fact that he was doing business with Medicare? What else do you point to to say? It occurs to me that a position of trust is something you've got to ask a further question, like position of trust as to whom? As the president of the company, he was clearly in a position of trust with respect to his employees. If there were other owners, which there weren't, he'd be perhaps in a position of trust with respect to him. But we're talking about doing business with somebody, in this case the federal government. What is it that puts him in a position of trust with respect to the federal government, other than the fact that he's doing business with the federal government? The nature of the business. The nature that it's providing services to patients in a specialized area. We're not talking about a contractor here who agreed to provide 1,000 widgets of a particular size, where any layperson can go and count the number of widgets and measure them. So it's health care. Yes, health care. That is a big part of it. It is a specialized area. He's chosen to engage in a specialized business, and it happens to be an area where the government is spending billions of dollars and can't afford and simply doesn't have the resources to double-check everything after the fact. There has to be some level of trust in the integrity of the providers. And it was that trust, it was that integrity. How does this work from the perspective of the ambulance service provider, in terms of having these patients go for dialysis? They get a call to transport the person? They have a certificate of medical necessity. How are they to decide this person doesn't require an ambulance? Well, I think part of that is you rely on the actual visuals. Understanding, again, that you don't necessarily have a president of the company who is medically trained. It is certainly possible that these companies could have a medical professional on staff. They have EMTs who are reporting in this case to them, ambulance transport. The evidence that was presented was that we had individuals who were being claimed to require medical transport, to require ambulance transport when they themselves were driving their own cars around town, going to the grocery store and going to church, walking out of their house down to the curb to get into the ambulance, with caregivers testifying that they were able to use wheelchairs to get around. You don't need medical training to at least say that. Was any information available to Sivchuk at the time he transported these people, or is this just post-transport that we're getting testimony of? Well, it was certainly available to Mr. Sivchuk, and it was contained in some of the trip sheets, and also the trip sheets discussing the ambulatory abilities. And, of course, the moment he gets that high-mark letter, it's time to excise those ambulatory abilities. It's time to change some of those CMAs. It's time to give instruction to his EMTs to not reference those ambulatory abilities anymore. That's, in the government's view, pretty damning evidence that he knew that this was problematic and didn't need to be a trained doctor to know it was problematic. But Dr. Duncan testified that EMTs are not qualified to make those determinations. Was there contrary evidence presented to Dr. Duncan's testimony? As to the qualifications of EMTs to give CMAs, I don't think anyone's claiming that they were going to give CMAs. They were going to make determinations of medical necessity. That was his testimony. They're not qualified to make determinations of medical necessity. I would be hesitant to say that all EMTs everywhere are qualified to make determinations of medical necessity. That being said, an EMT does have a certain level of training, that they can look at an individual walking out of the house. Was there testimony to that effect when Dr. Duncan testified that they are not qualified? There was not. The government basically relied on the fact that you had EMTs saying this to make out a prima facie case for loss amounts and whether something was medically necessary or not. It was more through the testimony of our own expert as to the actual medical necessity towards the patients. That's the approach that we took. But again, it would seem fairly obvious whether to a lay person or particularly to an EMT, if you have someone who is said to absolutely positively need medical transport, in one case because their doctor said they were bedridden, and yet they're getting up and they're moving around and they're going into town and things like that. Let me ask you, if I could, about Section 8C.3.4, the guidelines. That provision provides that a court can offset the fine imposed on a closely held corporation when one or more individuals who owns at least 5% of the organization has been fined. Here we've got the sole proprietor, no other owner. He gets hit with a fine and Advantage gets hit with another very large fine. The commentary to the rules says, as a general rule, where there's a closely held organization, appropriate punishment may be achieved by offsetting the fine imposed on the organization by an amount that reflects percentage ownership of the sentenced individual. There doesn't seem to have been any effort by the district court to take account of the fact that Mr. Sivchuk is Advantage, Advantage is Mr. Sivchuk if you're talking about the pocket that the money is coming from. Is that fair? I think that in a situation here, and I don't believe that Mr. Sivchuk raised that in the district court, and I therefore don't think it was put before the court. It's certainly permissive. The court is not required to do that. At that point, I think the judge, while it did take into consideration the fact that Mr. Sivchuk and Advantage were very closely related as a sole owner, it would be unfair to characterize him saying the judge ignored it. That being said, he may not have looked specifically at that guideline. Okay, well if the court is going to take the position that they're separate beings and I shouldn't count one as against the other, then how is it that the government proposes to collect the fine against Advantage? Since Advantage apparently has practically no assets, the real money is Mr. Sivchuk's frozen assets. Is the government intending to try to collect from Mr. Sivchuk? Because if it is, isn't that sort of going out of both sides of the mouth to say, on the one hand, you don't have to think about Mr. Sivchuk while you're finding Advantage, and then when it comes to collection time, saying Sivchuk and Advantage, they're the same, we can get the money from Sivchuk. To be perfectly honest, that would be something that falls with the financial litigation unit, and I really don't have a good answer to exactly how they would intend to recover that. Doesn't it seem likely that they're after the frozen assets? I think that is probably very likely. Really? Yeah. You don't think that's problematic in the face of 8C? Again, I don't think so because you don't have 8C being mandatory, and it was not an issue that was raised before the district court, and you do have an individual here who didn't make a simple mistake. You have an individual that sought to defraud the United States using his business to do so. All right. Thank you, Mr. Strude. Thank you very much. Your rebuttal, please. With respect to your last point, Your Honor, it's important to note that the fine was not ordered to be joint and several between Sivchuk and Advantage. My position is, and it was laid out at the beginning of this analysis for the sentencing reasonableness, was that Sivchuk is not responsible to pay Advantage's fine. The government, in its brief, said that that's what exactly they were going to do. They were going to go after him and use Mr. Sivchuk's assets and pay that fine. Well, that's not something before us right now, is it? Well, it's before you from the standpoint of whether or not it's reasonable to impose a $250,000 fine on Advantage, which is the alter ego of Mr. Sivchuk. I'd be real careful about talking about alter ego at this podium if I were you because you might just hand the government what it wants when it goes in and starts enforcing, don't you think? Well, I will certainly take the court's caution. I'm just wondering if that's really to your client's advantage. But there's another point with respect to the point that Judge Nigar had made, and that is with respect to there is a Pennsylvania statute out there that prohibits transporting a patient who needs monitoring. And the question becomes is if Sivchuk had and Advantage had these certificates of medical necessity, then that is telling Mr. Sivchuk that this person needs ambulance transport. It could be saying that, but it could also be saying I got somebody to sign this, but clearly it's wrong because they're walking down the block to get in the ambulance. That's what the government is saying is that it would be wholly unreasonable even for a lay person to have relied on a CMN in the circumstances that Mr. Sivchuk was charging the government for. The ambulatory abilities are a factor to take into account. They are not dispositive of whether or not the individual needs transportation by ambulance to dialysis. By virtue of the fact that dialysis creates a number of physical manifestations that are deleterious to the patient. So simply because the patient might be able to walk doesn't mean that the patient automatically needs wheelchair van transport. Otherwise we're talking about fact finding again, right? We're talking about somebody's got to look at the evidence and make a judgment about whether Mr. Sivchuk could reasonably have relied on these CMNs or whether it was so clear that it was fraudulent what he was doing, right? It's a factual determination. What was going on in the mind of a reasonable person like Mr. Sivchuk? Well, I would just suggest that it would be a Hobson's choice for him to have disregarded that Pennsylvania statute and God forbid something should happen and then what happens? He's then sued for the death of the patient. That's where he's at. Okay. All right. Thank you, Mr. Greenberg. Good morning, Your Honors. We'll take the matter under advisement. Thank you for your argument today.